*Reversed and remanded.*

Opinion delivered October 13, 1888.

## No. 2928.

## EX PARTE ED SMITH AND C. H. HUGHES.

HABEAS CORPUS—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a judgment refusing bail, murder being the offense alleged against the relators.

HABEAS CORPUS on appeal from the District Court of Leon. Tried below before the Hon. N. G. Kittrell.

The relators were held under separate indictments charging them with the murder of Robert Martin, in Leon county, Texas, on the sixth day of May, 1888. They sued out separate writs of habeas corpus, both of which, by agreement of each with the counsel for the State, were submitted upon the evidence adduced at the hearing of one. Both of the relators, being refused bail, prosecute appeals upon a single record, and this court, in a single opinion, reverses the judgment of the court below and awards bail to each in the sum of five thousand dollars.

W. T. Linson was the first witness for the applicants. He testified that he was a deputy sheriff of Leon county, and the constable of precinct number eight of that county. The deceased was arrested in Limestone county by an officer of that county for an offense committed in Leon county, and was taken from Limestone to Leon county, in company with his brother, Isaac Martin, by the said officer and the witness. Before reaching their destination the party separated, the Limestone officer and Isaac Martin going on, and witness and the deceased leaving the main road to summon some witnesses the deceased said that he wanted. After seeing the witnesses the deceased and witness returned to the main road and traveled it to a point about three-quarters of a mile distant from the town of Buffalo, in Leon county, where a road left the Buffalo and Personville road to join the Buffalo and Jewitt road, near which the witness lived. When they reached that point witness told the deceased to turn off, as he wanted to go by his house, about a half mile distant. When they reached a point about twenty steps from where the cross road left the Buffalo and Personville road, they were fired upon from ambush, two shots being fired. At the sound of the first shot the witness drew his pistol, and and asked deceased, who was a little in advance of him: "What does that mean?" About that time the second shot was fired, and witness fired at the point where he saw the flash of the weapon. Witness then dismounted, his horse becoming restless, with his pistol in his hand, firing a second shot as he dismounted, toward the point he first shot at. Witness did not see the deceased after the first shot was fired until he got on the ground. He then called to deceased, whom he heard hallooing, and finally saw lying on the ground. Approaching within eight or ten feet, he asked deceased if he was hurt, and deceased replied that he was killed. Witness then sat down by the deceased, holding his pistol in his left hand and the bridle rein of his horse in his right. His horse, pulling so, he got up and tied him to a tree, and returned to the deceased and asked if he could do anything. Deceased replied by asking him to straighten his body and arrange his head comfortably. Witness did so, and then concluded that he could not longer remain there alone. He then called to Mrs. Hay, whose house was but a short distance off. Mrs. Hay not answering, the witness went to her gate and hallooed to her, there being, as witness knew, no male person on her place. Mrs. Hay an-

swered upon being satisfied that it was witness calling, and asked what witness wanted. Witness told her what had happened, and asked her to give him a light. She produced the light, and witness asked her to go with him to the deceased. With some reluctance, the result of fear and excitement, she consented to go to the deceased as soon as she dressed herself properly.

Witness went back to deceased, taking the light with him. He sat down by the deceased, but became frightened when he thought of having the light with him. He then rose to his feet and called Mrs. Hay, who replied that she was coming. Presently she appeared and witness asked her what she thought ought to be done. She replied that assistance ought to be had at once. Witness then asked her if she could remain with the deceased while he went for Mr. Bradford or the doctor, the former of whom he could soonest get. Mrs. Hay, being very nervous and frightened, consented very reluctantly to stay and for witness to go. Witness then mounted his horse and rode to Mr. Bradford's house, which was about four hundred yards distant. He found Mrs. Hay's daughter Bettie and a negro man and woman at Bradford's. The negro man was called —— [illegible]. He got Mr. Bradford to take his horse and go after the doctor, and he and Miss Bettie Hay went back to the deceased and Mrs. Hay. The negro man and woman disappeared. Deceased asked several times to be turned over, and his requests were complied with by the witness, assisted by Mrs. and Miss Hay. When Bradford got back with Doctor Bolter the latter suggested removing the deceased to Mrs. Hay's house. Accordingly a blanket was brought from the house and the deceased was placed upon it. Mrs. Hay led the way with the light, and Doctor Bolter, Mr. Bradford, witness and Miss Hay followed, bearing the deceased. Before reaching the house Miss Bettie Hay became too tired to proceed and a stop was made for her to rest. Deceased died while Miss Hay was resting.

After the witness got back to the deceased with the light and between the time he called Mrs. Hay and her arrival—between fifteen and twenty minutes having elapsed since the shots were fired—deceased said to witness: "Hughes and Jim Smith and Ed Smith are the men who shot me. I saw the faces of all three of them by the flash of the gun; and I think the Parkers had something to do with it." Twice afterwards he made substantially the same statement.

Cross examined, the witness said he examined the ground on the next morning, and, by his measurement, the shots were fired from a point about fifteen steps distant from the road. Not more than two seconds, as indicated by the witness snapping his fingers, intervened between the two shots. Witness heard no noises other than the shooting until immediately after he fired his second shot, when he heard the rustling of bushes. He fired directly at the flashes of the gun or guns, both of which flashes he saw plainly, but the second more distinctly than the first. The noise referred to by the witness sounded like a body or bodies scraping against the bushes. At the point mentioned by him as the point where the shots were fired, the witness, in his examination the next morning, discovered what he believed to be indications of the recent presence of a man or men. These indications consisted only of the displacement of dirt and the disturbance of fallen leaves at the foot of a tree; but the dirt and leaves commingled left distinguishable a single human track, which showed that one man had stood at that tree for a considerable time. It was impossible for the witness to identify that track as the track of any particular person. Between that point and the point on the road where the shots took effect upon the person of the deceased, and upon a direct line between those two points, the witness found some fragments of gun wadding. The view from the tree to the road where the deceased received his wounds was clear, but at the tree there were some hickory limbs bent over. In the opinion of the witness, those limbs standing upright were an obstruction, and were thus bent by the man at the tree to clear his view. There was little, if any difference between the distance from the tree to the main road and that from the tree to the point on the cross road where deceased was shot, that point being near the intersection of the two roads. The brush between the tree and the main road was very thick. A person on the main road could not see a person stationed at the tree, on account of the brush. Witness was about six feet behind, and a little to the left, of deceased when the latter was shot, deceased being on that side of the road from which the shots were fired. Deceased was shot in the left arm, from the elbow to about half way down to the wrist, and in the side, ranging to the center of his back. Five buckshot entered the arm, and fourteen the side and back, of which a few penetrated the thick of the buttocks and thigh.

It was too dark for the witness to see the position in which deceased was sitting on his horse when he received the fatal shots. Witness examined the ground at first good day light on the next morning, Squire Bryan being with him. They were the first persons to reach the ground after the shooting. On that morning, at a point between forty-five and fifty feet from the tree heretofore mentioned, the witness found the hat which was exhibited in evidence at the inquest over the body of the deceased. It was a black straw hat, about four or five inches in height. Witness delivered the hat to Squire Bryan, and was satisfied that the hat he afterwards saw at the inquest was the same; it had the same perforations made by the manufacturer, the same depression in the crown, and the same remnants of a once entire paper, pasted inside. But one hat was exhibited at the inquest, that witness saw. The witness was not in the room when Mr. Owens was examined as a witness. Deceased died about an hour and a half after he was shot, and he was shot between eleven and twelve o'clock. Deceased was arrested in Limestone county, twelve or thirteen miles from the point in Leon county where he was shot, and, when shot, he was in the custody of the witness. Deceased made the statement as to who shot him three separate times; twice in the presence of Mrs. and Miss Hay. He asked several times to be raised up, and at one of these times he added: "Now lay me down to die. Ladies, please pray for me." Witness could not remember whether either of the statements as to who shot him was made after he asked to be laid down to die and for the ladies to pray for him. His statement was that the men who shot him were Jim and Ed Smith and Hughes. He did not say what Hughes. Witness found evidence of the presence of but one man on the ground, and could not track him away from the tree. He looked for the location of other parties on the ground, but could find nothing to indicate their presence. There was no moon on the night of the killing, but witness could not now remember whether or not it was cloudy.

Mrs. Sarah Smith, the wife of the relator Ed. Smith, was the next witness for the relators. She testified that she and her husband lived on Alligator creek in Freestone county, about six miles from Buffalo, and were living at that place on the seventh day of May, 1888, about which time she heard of the killing of Robert Martin. The seventh day of May was Monday. Witness heard of the killing on Tuesday. On Sunday,

May 6, 1888, witness and her husband went home from old man Wade's, where they had been attending the sick. Her husband remained at home throughout that night. On the next morning he and his two sons went to his old home place to clear off some timber. Witness took them their dinner about two o'clock. When they went to work after eating their dinner, the witness went home. Witness next saw her husband between day light and sun rise on the next morning, Tuesday, at which time he got home from Mr. Hughes's house. When witness left her husband clearing timber, on the previous day, he told her that, after quitting work, he was going to see if he could get Hughes to help him burn brush the next day. The boys, one about seventeen and the other about fifteen years of age, got home about dark on that (Monday) evening. Witness's husband went back to the clearing, after getting his breakfast on Tuesday. The "old home" or creek place referred to was about a mile from where witness and her husband lived. Mr. Hughes lived about a mile from the old home place, and about the same distance from where witness and her husband lived. Witness's husband went on foot to Hughes's place on Monday evening.

On her cross examination, the witness said that she knew of her husband spending the fatal Monday night at Hughes's house, only by his having told her so. She knew that he was not at home during that night, nor at any time on that night.

Perkie Smith, son of the relator, Smith, testified, in behalf of the relators, that he and his brother and his father worked all day on Monday, May 7, 1888, on their old home place, in Freestone county, relator Smith cutting rails, and witness and his brother hauling them. After work, witness went home and the relator Smith went off towards the house of the relator Hughes. The relator Smith came home next morning, Tuesday, May 8, between sun rise and day light. Relator Smith, witness and his brother went back to the home place to resume work on the said Tuesday morning, and all of them worked there throughout that day. The relator Hughes also worked on that place all of that day.

Cross examined, the witness said that the relator Hughes did not work with the relator Smith, the witness and his brother on the old home place on Monday, May 7. Hughes spoke about the killing of Martin soon after he got to the home place on Tuesday morning. Witness asked no questions that drew

out Hughes's statement that Martin was killed.   Presently, when witness's father came up, Hughes again said that Martin was killed on the night before.   All of the parties then went to work as though nothing had happened.

On redirect examination, the witness said that before relator Hughes said anything about Martin being killed, Jim Smith, witness's uncle, and a man whom witness did not know, rode up to the fence and called relators Hughes and Smith to them. The said parties brought the news of the killing of Martin. Recross examined, the witness said that his father, the relator Smith, and the deceased were not on speaking terms.   A few days before the killing of Martin, relator Smith left the field to go into the bottom.   Witness did not know whether or not he went into the bottom. He did not know on what day his father went to a pen to examine some cattle.   Witness did not, of his own knowledge, know where his father was on the night Martin was killed.   This witness was corroborated by his brother, William Smith.

Susan Hughes, wife of the relator Hughes, was the next witness for the relators.   She testified that she and her husband lived about a mile from the relator Smith's house, and were living there when Martin was killed.   Her husband was at home all day on Sunday, May 6, 1888, except for a short time in the evening.   He was at home all of that Sunday night.   He spent a part of the day on Monday, May 7, at home, and part of it in his field.   The relator Ed Smith came to witness's house between sun down and dark on that evening, and remained until good day light on the next morning.   The relator Hughes passed the whole of that night at home.   That was the night on which Martin was killed.   Four of witness's children, including her fourteen year old daughter, Jennie, were at home on that night, and two were at Mr. Smith's.   Witness and her husband slept in the same bed, and the relator Smith and the four children slept in other beds in the same room.   Relator Hughes worked with said Smith on Tuesday, and, except one rainy day, all the balance of the week.

Cross examined, the witness said that Smith explained his business to Hughes as soon as he reached the house.   The parties then sat around the fire and talked until about ten o'clock, when they retired, and slept until just before day light, when Smith got up and left.   The deceased, Martin, was not discussed on that night.

---

---

At this point the State made the witness its own, and, testifying in that capacity, she said that she did not know the nature of feeling which existed between her husband and the deceased, and denied that, on the occasion of the fight between Wade and deceased, her husband sprang upon and beat the deceased. Her husband was not present on that occasion, but was beyond Buffalo creek from where it occurred. She could not now remember the kind of clothing Smith wore to her house on Monday night; but, to the best of her recollection, he had "a kind of white hat with a band around it," and wore a pair of brogan shoes. Witness had been married to Hughes twenty years, and had never seen a straw hat of any kind on his head.

Miss Jennie Hughes, daughter of the relator Hughes, testified for the relators, that her father worked in his field on Monday, May 7, and came home to his dinner. Relator Smith came to the house between sun down and dark, and remained all night, leaving about day light next morning. The family and Mr. Smith slept in the same room, but in different beds. Witness heard of Martin's death on Tuesday night.

On her cross examination, the witness said that she knew the fatal Monday was the seventh day of the month from the fact that on that very day she examined the almanac for the purpose of ascertaining when the moon changed, and found, according to her best recollection, that it was to change on the following Sunday. She denied that she had ever discussed the murder of Martin with her mother or anybody else, but, when pressed by the State, she admitted that, subsequent to the murder, she met Mr. Dotson and Mr. Giles at Smith's house, on which occasion Dotson asked her where her father was on the night that Martin was killed. Witness, her mother, Smith and his little boy were present, and agreed that the killing occurred on the seventh. She was not positive as to which of the party suggested the seventh as the correct date, but she thought it was either Dotson or Giles. Witness thought that she then first learned that the fatal Monday was the seventh day of the month. She did not yet know it to have been the seventh except by hearsay.

Captain J. N. Black, sheriff of Leon county, was the next witness for the relators, who, in connection with his testimony, introduced in evidence the following plat:

Statement of·the case.

The witness testified that, about eleven o'clock on Tuesday, May 8, 1888, he went to the scene of the killing of Martin on the night before, to make an examination of the same. The condition of the ground at the foot of a certain tree indicated the recent presence of a man but left no foot track clearly distinguishable. There was no evidence there of the presence of more than one man, but others, if lying down or standing still, could have been there and, because of the nature of the soil, have left no traces. The tree referred to stood about forty feet distant from the cross road which led from the main Buffalo road to the Linson field road as shown on the plat. In addition to the ground signs mentioned some bushes near the tree were bent over as if by a person at the tree to obtain a clear view of the road. At the corner of the fence, on the main Buffalo road, on the north side, the witness saw a place where a man had stood. "It was about the same distance from where the party stood from the road leading to Linson's and from the main road to Buffalo."

Cross examined, the witness said that the place in the fence corner mentioned was in Mrs. Hay's field, and it was scarcely ten feet from the main Buffalo road. Witness was unable to identify a track at the foot of the tree, and could only see that the ground had been tramped in a circle. No traces of a person going to or leaving the tree could be found. The track at the fence corner was distinct enough to show that it was made by a pointed shoe. On an old untraveled road marked C D on the plat the witness saw tracks made by three separate and distinct shoes. Those tracks were lost at a point about one hundred and fifty yards distant from the tree behind which the person or persons who fired the fatal shots are supposed to have stood. One of them was a track of a sharp pointed shoe like that found in the fence corner; another was the track of a square or box toe shoe, and the third was what the party designated as the moccasin track, from the fact that the right shoe showed to have no heel, and that the side of the shoe left an impression. Witness and his party struck these three tracks after leaving the road to Linson's, about fifty yards above the point D, as shown on the plat. "Did not find the three tracks, the moccasin track not being found there at that place. The two tracks, the pointed and square toed, went south towards Linson's field, then left the road and went into Linson's field and then the two tracks seemed to go square across Linson's field, bending a little north;

but first, before they turned on this trail leading to Linson's house, the moccasin track joined the other two, coming from the direction we saw it."

The three tracks then followed the trail E F toward's Linson's house. The pointed and square toed tracks passed Linson's house, went down towards the main road, turned back and got behind some logs about forty feet distant from the house. The moccasin track left the other two before reaching Linson's house, at a point about one hundred yards distant, crossed a "dug out" and went up the right side of it. Witness could not tell how near the house that track approached in passing, because of the nature of the ground. The witness and his party then followed the tracks around and were led by them back into the trail over which they approached the house. They then trailed to Bradford's field and thence through the woods, occasionally losing the moccasin track, which reappeared elsewhere. The moccasin track left and rejoined the other two at frequent intervals. They trailed the tracks through the bottom, but lost them in the quick sands of a woods pasture. Witness then went home for the night. On the next morning he traveled the Cedar creek and Buffalo roads, and at a point within a half mile of Cedar creek he found tracks traveling that road both ways but could not identify them as the tracks he followed the day before. After passing Cedar creek he reached a "red hill," where he found the tracks he followed the day before. They were going both ways. He followed those tracks to a point within a mile of the place of the killing, where he lost them in the confusion of tracks left by pedestrians. If those tracks were ever traced any further witness did not know it. Witness had never been to the house of either of the relators and did not know where they lived.

Re-examined, the witness explained that the point where he first found the tracks referred to in his cross examination, on Wednesday, was the point marked W on the plat. There were several impressions there, and, although the witness thought those tracks were the same that he had followed on the day previous, he could not positively identify them. But, at the point three hundred yards east of the church, marked G on the plat, he identified the tracks as those he followed on the day before. The points mentioned, and the tracks going both ways, were on the Buffalo and Jewitt road, via Cedar creek, and the point W was not more than half a mile from Cedar

creek. He lost the tracks on a hill between the places of Bradford and Bob Baker, more than half a mile from the place where he found them on the day before. Witness did his last tracing of tracks on Wednesday. He did not remember a hard rain on Tuesday. If it rained at all it was very little, and not enough to affect foot tracks.

Mrs. Sarah Smith and Mrs. Hughes each being recalled for the relators, testified that their respective husbands were wearing at this trial the same shoes they wore on the night of the murder, and that they had no other shoes at that time. The shoes of each of the relators were ordinary brogans.

The case for the relators was closed at this point.

R. M. Bryan was the first witness for the State. He testified that he, as justice of the peace, held the inquest upon the body of Robert Martin on May 8, 1888. Witness reached the scene of the tragedy before the body was removed to the house from the place where Martin died. It was taken to the house about three o'clock on the morning of Tuesday, May 8, 1888. About sun rise, witness, Linson and Mr. Bradford examined the ground. While witness was circling around the tree from which the fatal shots were supposed to have been fired, Linson and Bradford called to him that they had found a hat. Witness went to them and found on the ground, a short distance from the tree, an old style, open woven black straw hat, four and a half or five inches in height. It was the same hat which he exhibited to Mr. Jim Owens at the inquest on the same day.

Cross examined, the witness said that he kept the hat in his custody for a short time after the inquest, and at the next term of the district court delivered it to the clerk. While in his possession witness kept it under his counter. The open net work in the hat was near the top of the crown, and there was a rent near the top which extended nearly half around the crown. It was a hat exactly like the one now exhibited by counsel for the relators, and, if the hats were not one and the same, "they were brothers"—by which witness meant they were similar, even to the rent. Witness wore a hat in every way similar, except the rent, about six years before this trial, and would venture the opinion that the two came from the same lot. He got his from Mr. Pearlstone, the merchant. He never saw hats of that stock in any store except Pearlstone's, but would not say that other merchants did not have them.

Mrs. Mary Hay was the next witness for the State. She testified, in substance, that she did not hear the reports of the gun at the time Martin was killed. Linson called for her to get a light. About the time she did so, she looked at her clock and saw that it was just five minutes to twelve. She went to the place on the road where Martin was lying, and Linson went after Mr. Bradford. Martin did nothing, nor did he speak a word while Linson was gone, but after Linson returned he said twice that Smith and Hughes killed him. If he said what Smith or what Hughes, witness did not understand him. He said once that he was going to heaven, and witness thought, but was not certain he said that he was going to die, and asked to be prayed for, but whether this was before or after his statements as to who killed him, witness could not say. He said, one time, that the Parkers had something to do with it. No person asked Martin any questions. All that he said, he said voluntarily. He claimed to have recognized Smith and Hughes by the flash of the gun. On her cross examination the witness said the first statement as to who killed him was made by Martin about the time that Linson got back from Bradford's. She could not tell how long Linson was gone, nor could she tell how long she had then been with Martin. Bradford was not present when Martin made the statements as to who killed him, but Linson was.

James A. Owens was the next witness for the State. He testified, in substance, that he lived in the town of Buffalo, Leon county, Texas, and was in the employ of Mr. J. M. Pearlstone, as a salesman in his store, and was so employed on and for some time previous to May 7, 1888. Witness was acquainted with both of the relators. He was examined as a witness at the inquest over the dead body of Martin, on which occasion Judge Bryan exhibited to him a certain straw hat which the witness identified as a hat which, on the preceding Friday, he had given to the relator Smith. He identified the hat by means of a break which ran around the net or woven work on the crown. Smith asked witness for the hat, and witness replied that it belonged to the boss and he could not give it away. Smith then remarked that it was of no use, and called witness's attention to the break around the crown. Witness examined the break and said to Smith: "Well, take it along, and I won't have to take it in stock again, but don't let the boss see you take it." That and other hats had been in stock a long

time.  Witness did not know where they came from, and he never saw any hats like them anywhere else.

Cross examined, the witness said that he gave a hat of the same kind to the relator, Hughes.  He did not critically examine the hat he gave Smith, but put his finger in a particular break near the crown, by which particular break he identified it afterwards on the inquest.  There were then other breaks in it, which may or may not have been in it when he gave it to Smith.  The hat now exhibited by counsel was the hat given by witness to Hughes, and it was like the hat he gave Smith, and like other hats of the same kind now in Pearlstone & Son's stock, and was in the same cost mark.  The said stock of hats were kept in the grocery department of the store, and near the flour.  Hughes picked up the hat given him before Smith picked up his.  Witness had no recollection that Hughes tried on two or three hats before he got one to fit him.

Frank Garrett testified, for the State, that he was present in Pearlstone's store on the Friday before the fatal Monday, when Mr. Owens gave the relators each a black straw hat, which hats the relators wore out of town.  The hat given to Smith by Owens was one which Owens sometimes wore about the store.  Witness had no recollection of Owens saying anything to Smith about not letting the boss see him take the hat.  He did not remember that Owens handled either of the hats when he gave them to Smith and Hughes.

Doctor W. E. Vick testified, for the State, that he knew the relators only by sight.  He saw them at or near Robert Martin's house about sun down on the evening of May 1, 1888.  About that time in the evening Martin saw somebody going by his cow pen, and, thinking it was a boy who stayed at his house, called to him:  "Is that you, Johnny?"  He then saw that the person was the relator Hughes, and that the relator Smith was with him.  Both of the relators were walking, and had guns with them.  Martin was approaching his house on horseback when he saw and took Hughes to be Johnny.  When he recognized the relator Hughes, Martin said to him:  "Mr. Hughes, I am going away, and I want a settlement.  You are owing me a little; now, let's settle up like men."  Hughes replied:  "I owe you nothing."  Martin retorted:  "Yes, you do; and I want a settlement."  Hughes said:  "If I owe you anything, come down to my house and we will settle pretty d—d short."  Hughes and Smith removed their guns from their

shoulders, and Martin jumped off his horse on the side from them. Smith then told Hughes to tell Martin something, which witness did not understand. Martin then said: "I want my money; I don't want a fuss." Hughes replied: "If you want a settlement with me, you can get it pretty d—d soon; and if you don't mind, you will get it between two suns before you leave here." Hughes and Smith then left, going towards Hughes's house a half mile distant. Smith lived a mile further on in the same direction.

Cross examined, the witness said that, when this conversation occurred between Hughes and Martin, he, witness, was on his horse, forty or fifty yards distant. He was on his way from Shorty Martin's house, where he had been professionally, to Robert Martin's. He stopped his horse to keep from joining the parties as soon after he heard Martin call Johnny as he ascertained the parties were angry. They talked in a loud tone of voice.

Isaac Martin, the brother of deceased, testified for the State, that on the second day of May, 1888, he went to the house of Hughes to see him about a yearling he had sold a negro and still had in his possession, and which the witness purchased from the negro. While at Hughes's house, Hughes said to witness: "Bob (the deceased) played hell last night. He cursed me for everything he could think of." Witness, in reply, said to Hughes: "You fellows ought to behave yourselves and not do that way." Hughes replied that he would see deceased at another time and make him d—d sorry; that a man could not call him the things deceased did and get off with it. His words were substantially: "I'll call him to time, at another time." He said nothing about seeing him "between two suns" that witness could recollect. Witness knew that hard feelings existed between his brother on one side, and Hughes and Smith on the other, but he did not know the cause of the trouble. Witness did not see Smith at Hughes's house on May 2, 1888. Witness lived on the north side of Buffalo creek, about two miles from Hughes, who lived nearly due west from Cedar creek church. Smith lived a little northwest from that church. The State rested.

The relators called W. T. Linson as their first witness in rebuttal. He stated that the warrant for the arrest of the deceased was handed to him on Saturday, May 5, 1888, by a negro named Louis Davis. That being convention day, the witness

was very anxious to remain in town, but the negro appeared very anxious for the execution of the writ. Witness finally told him to go about his affairs, promising to have deceased at the appointed time for trial. He remained in town all day Saturday and until after Sunday school on Sunday, when he hired a horse from Mr. Holder, and started to Freestone county with the warrant to procure the arrest of deceased. He went to Conaway's house in Freestone county, and there passed Sunday night. Next morning witness and Conaway went to the house of Constable Dare, about a mile and a half distant from Conaway's house. Witness disclosed his business to Dare and asked his assistance. Dare replied that he was then expecting the justice of the peace and county attorney to hold the examining trial of a negro woman charged with child murder, and asked witness to await their arrival. Witness went to dinner with Dare, when the justice of the peace indorsed the warrant. After dinner Dare and witness left to apprehend Martin. They went first to Dew and then to Lora, at which latter place he met Mr. Grayson, to whom he confided the nature of his business, and asked the whereabouts of Martin. Grayson said that he had heard that Martin was at Carter's place. En route they met a man named Fulton who directed them to Mr. Currant's place. At Currant's they learned that Martin's stock of cattle were at Hall's place, two miles beyond. They found the cattle in Hall's pen. Dare asked for Martin, who was called from his supper in Hall's house. Dare then served the warrant and arrested Martin.

Soon afterwards witness, Dare, deceased, and his brother, Isaac Martin, started back to Leon county; Dare and deceased riding abreast, and witness and Isaac Martin riding together, until Currant's house was reached. Deceased called for Currant, with whom he wanted to have a few minutes private conversation, but, Currant not being at home, the party proceeded, witness and deceased riding together and Dare and Isaac riding together. They had gone about a hundred yards when they were called back and informed that Currant was in sight on his return home. Currant and deceased had a short private talk and then the party went on to Fulton's house, where deceased had a short private talk with Fulton. Deceased then said that he wanted to see all of his witnesses whom he named that night. Witness replied that if they were to see those witnesses, whose houses were considerable distances apart,

they had better stop at some house and feed their horses, for which he would pay. Deceased remarked that they could stop at his house and feed without cost. The party then traveled seven or eight miles further to where the road going to deceased's house left the main road they were traveling. At this point it was suggested that Dare and Isaac should pursue the main road, summoning the witnesses on that road, and that witness and deceased should take the road to the latter's house, gathering the witnesses on that road. Isaac Martin said that he wanted to see a party on that road and had to go across the creek to summon his brother Jack, and accordingly Dare and Isaac took that road and witness and deceased pursued the main road until they turned off to go by witness's house, at a point about twenty feet distant from where the fatal shot was fired. Witness did not see either of the relators between the time he left Buffalo on Sunday and the killing of deceased. His wife only knew his destination when he left Buffalo on Sunday. A Mr. Harrison, Mr. Conaway, Mr. Dare, Mr. Grayson and the justice of the peace, who endorsed the warrant, were the only persons in Freestone county who knew the reason of witness's presence in Freestone county prior to the arrest. Witness was never at the house of either of the relators, but was familiar with the neighborhood in which they lived. Neither of them lived on the road traveled by witness and deceased on the fatal night. Witness saw Isaac Martin about nine o'clock on the next morning, but did not see Dare for several days after the killing.

James Bradford testified, for the relators, that he lived about three quarters of a mile west of Buffalo, on the Buffalo and Personville road, and about four hundred yards from the point where Robert Martin met his death. The killing of Martin occurred about twelve o'clock on the night of Monday, May 7, 1888. Witness made an examination of the ground early on the morning after the killing in company with Mr. Linson, Squire Bryan, Mr. Wallace and Charley Phillips. Linson said that the fatal shots were fired from the right hand side of the road, and on that side of the road twelve long steps distant, the witness found, at the foot of a black jack tree, indications of the recent presence of one person. Impressions of a knee and the toe of one foot showed that a person had knelt at that point for some time. A small hickory bush that grew near the tree, between it and the road, showed to have been recently bent over, and

discoloration of leaves and soil showed that the person while there had chewed tobacco and expectorated copiously. About twelve steps distant from the tree a hat was found. At a point between one hundred and one hundred and fifty yards farther the party found the foot tracks of a man where he went into an old road. After following that road to the Buffalo and Personville road, and thence to Mrs. Hay's they took Martin's body to Buffalo, and Linson telegraphed to Oakwoods for Sheriff Black. The track referred to by the witness was a run down track, and was the one afterwards designated by the trailers as the "moccasin" track. Sheriff Black arrived at Buffalo by the morning train and witness went with him to trail the tracks. His testimony as to the course, meanderings, etc., of the said trail was substantially the same as that of Sheriff Black.

Mrs. Sarah Smith testified, for the relators, that her husband, the relator Smith, on the Thursday preceding the fatal Monday night, brought home an open woven black straw hat. There was a break in the open woven work near the crown. He wore that hat to Mr. Wade's on Sunday. Witness then hung the hat on a nail in one of the rooms in her house, where the said hat still was. It was taken from that nail but once after witness hung it there, and that was on Tuesday, when she wore it to the house of Mr. Jim Smith. Relator Smith did not wear that hat on Monday, May 7, 1888.

W. F. Wade testified, for the relators, that he lived about four hundred yards distant from the relator Smith, and about a mile distant from the relator Hughes. Smith and his wife spent the day at witness's house on the Sunday preceding the fatal Monday. Smith wore on that occasion an open woven black straw hat, which the witness would call a ventilator. Witness's wife and Mrs. Smith made much sport of the hat, and witness remarked that he would not have brought such a hat home, as it "would turn neither rain nor shine." Mrs. Smith then remarked that she was going to cut the hat down for one of her children, to which Smith said he would object. Witness examined the hat and discovered some breaks in it, and was of opinion that it was the same hat now exhibited to him. Witness saw Smith again on Monday and Monday evening, at which times he was wearing another hat. On Tuesday witness saw Mrs. Smith wearing the hat, and said to her: "Hallo! you've taken charge of the old man's hat, have you?" She re-

plied: "Yes; I had to put my bonnet in wash, and have nothing; else to wear."

Cross examined, the witness said the paper on the inside of the hat, when he examined it on Sunday, May 5, was torn just as it shows to be on this trial—neither more nor less. Witness looked under the band and inside paper, but did not look for a cost mark. "They might tear another hat that came out of that box and I wouldn't know the difference, and might show me a hat out of the same box and I wouldn't know the difference unless there was some difference in the tearing or breaking." It was admitted by the State and the relators that the hat in evidence was not the hat that was found on the scene of the murder.

W. T. Linson was again recalled by the appellants and testified substantially as did Sheriff Black about the trailing of the three tracks, the course pursued, and the meanderings of the same. In addition, he testified as follows: "I stated in my direct examination that we found a hat on the ground near where the killing occurred. The hat shown me now has the same marks, and is the same kind of a hat in every particular, and I recognize the breaks in the rim, and it has the same piece of paper sticking in the crown. I recognize everything except the break in the crown—that is as to locality of the break, but remember a break in the crown—and recognize the spots of mud on the crown."

Doctor N. W. Bolter testified, for the relators, that he was called to see Robert Martin on the night that he was shot, and found him lying in the road at the point where he was said to have fallen. He reached Martin about ten minutes before his death. Linson said to Martin: "Bob, the doctor has come." Martin answered: "Give me some water quick, or I will die." An attempt was then made to move him to a house. Before they could get him far he began to slip from the blanket, and said: "Put me down or I will die." He was put down and died soon afterwards without again speaking. Witness did not examine Martin's wounds, but saw Doctor Joyce examine them next morning. He, however, took no particular notice of them, but observed that they took effect in the hips and in the region of the kidneys.

Cross examined, the witness said that he thought Martin was conscious when he reached him. He was conscious enough to ask for something to relieve him, and for water, and when he

was taken up and asked to be put down to prevent immediate death. Re-examined, the witness said that, in his opinion, Martin knew what he was talking about when he asked for water, medicine and to be put down. It was not probable that an unconscious person could make his wants known. A man might not, in the then condition of deceased, be as clear in mind as he would be if not hurt and not suffering, and witness would not say that he was perfectly clear in mind, but he appeared to realize that something ought or might be done to alleviate his pain. A wound severe enough to shock would not necessarily affect a person's mind at once, unless some of the nerve centers were injured. If it involved any of the nerve centers it would most probably affect the mind at once. The nerve centers were situated in the brain and spinal cord. An injury to the spinal cord, or the rupture of a membrane, sufficient to permit the escape of the subrochnoid(?) fluid would produce a comatose condition, which might be either total or partial unconsciousness, according to the severity of the injury. Such injury as that inflicted upon Martin, would ordinarily, independent of injury to the nerve center, cause death within an hour or two. Such a wound as Martin's would not necessarily produce unconsciousness, unless it involved the internal viscera, which would produce blood poisoning, and thus involve the brain. But Martin did not live long enough for blood poisoning to supervene. A shock severe enough to produce death within an hour and a half would, in the opinion of the witness, affect the brain to some extent, but not necessarily to the extent of producing unconsciousness. It might produce partial delirium. The nervous shock would communicate with the brain instantly.

Re-cross examined, the witness said that the result of a shock to the nervous system depends largely upon the physical condition of the person shocked. Witness considered Martin's to be a dying condition from the moment he reached him. He appeared to be suffering great agony. Had he been in a comatose or semi-comatose or a delirious condition of mind, he could not have displayed the degree of intelligence he did, nor could he have realized his condition, as he apparently did. Death may result from internal hemorrhage without affecting the mind in a larger degree than ordinary death. Martin's wounds were very near the abdominal *aerta* (?) a very important blood ves-

sel. If, however, the wounds involved that vessel, the witness thought that Martin's death would have ensued sooner than it did.

Doctor J. W. Joyce, for the relators, after describing the wounds on the body of deceased, which he saw only after death, testified as follows: "The wounds received by Martin would most probably produce a severe shock to the nervous system. The effect on the brain of a wound such as would produce death in an hour and a half and cause a severe nervous shock, would, I suppose, affect the brain, but the question is broad, and I don't know that I could give you a direct answer. It appears to me that the brain would feel the shock from such a wound, but in some instances, after receiving such a wound, a person would, and in others would not, be calm. I am not prepared to say what the effect would ordinarily be. Martin could have died from the wounds I saw, and yet have been in such condition, mentally, as to know what he was talking about."

The district clerk of Leon county identified the hat exhibited to him as the identical one delivered to him by R. M. Bryan, Esq., and which he has since kept under lock and key. It was in the condition now that the witness received it.

R. M. Bryan, recalled by the State, identified the hat shown him—the one referred to by the preceding witness—as the hat found on the ground of the tragedy by the witness Linson. The said hat came into witness's possession on the morning after the killing. Martin's body was taken to Mrs. Hay's house and thence to witness's store. Witness left the hat with the body at Mrs. Hay's, and received it again when he received the body at his store. He did not know who had charge of the hat in the interval. The condition of the hat when found and its present condition, so far as the witness could see, was the same.

J. M. Pearlstone, of Pearlstone & Son, testified as follows: "I presume the hat shown me is from my store. I don't know. I know we had hats like that to sell, but I would not swear positively that this hat came from my store. I did not see it go out. The mark on the hat was Sam Levy's, a merchant, to whom the hat belonged. I recognize the second hat you hand me by the mark on it. We had hats like this in stock since 1881, but since the fire of October, 1886, we have not offered them for sale." (The trial judge explains that the first hat referred to by the witness was the hat mentioned by Bryan and Owens as the hat found on the ground of the killing, and the

second as the hat claimed by the defense as the hat of the relator Smith.)

J. F. Singletary, a clerk of Pearlstone & Son, testified that he was acquainted with the marks on the goods in Pearlstone & Son's store. The mark on the first hat handed him was the mark of Sam Levy, who failed, and whose stock was bought by Pearlstone & Son. He could find no price mark on the second hat shown him.

R. M. Bryan, recalled, testified that he held the inquest upon the body of Martin between ten and eleven o'clock on Tuesday morning. He did not issue the warrant for the arrest of the relators. That warrant was issued by a justice of the peace in Freestone county, which warrant was returned to the witness. The warrant under which Martin was arrested for driving a yearling off the range, was issued by witness early on Saturday morning, May 5. Louis Davis made the affidavit.

Frank Falk testified, for the relators, that, at the request of Linson, he and Mr. Tutor left Buffalo about ten o'clock on Tuesday morning, as well as he could remember the time, to notify Martin's people of his death. They went first to John Smith's and told it there. Thence Jim and George Smith went with witness and Tutor to Shiney's house, and Shiney was asked and promised to take the news to Martin's family. En route, witness saw the relators at work in a field. Jim Smith had some conversation with them, which witness did not hear. Some boys were then in the field burning brush. J. K. Tutor corroborated this statement.

James A. Owens, recalled by the State, testified that on the day the relators were brought from Fairfield for the examining trial, Jim Smith's son brought a hat into Pearlstone's store to be examined by the witness. That hat looked like, and the witness thought it was, the hat he gave Mr. Hughes, as before testified. That hat had no break in it, and was not the hat the witness gave to the relator Smith. The hat now handed witness has a break in it, and, if it is the hat witness examined, as just stated, the break has been made since he examined it.

Ike Martin, a brother of the deceased, testified, for the State, that deceased was gathering stock for several days previous to his death, helped by the witness. His cattle were put in Currant's pasture, in Freestone county, on the Thursday before his death. On that day the two relators and Jim Smith, George Smith, Jim Parker, Henry Parker and the negro, Louis Davis,

came to the pen and said that they had come to inspect the cattle. They did not say they were looking for any particular cattle. Mr. Jim Smith went into the pen among the cattle, and when he came out he told the others that he could find no animals among them that did not belong to deceased. Davis did not go into the pen, but sat on his horse outside and looked at the cattle as they were driven out. He made no claim on that day to any animal or animals then in possession of the deceased, but subsequently claimed an animal that was then in the herd. The relator Hughes at that time had a Winchester rifle with him. Deceased was in the pen when the parties came.

Andy Davis, the brother of Louis Davis, who was the complainant in the warrant upon which Martin was arrested, testified, for the State, that on Friday morning before the killing of Martin, he went from Doctor Oliver's to his work on the road, where he found his brother Louis. They finished work on the road between three and four o'clock, and Louis went to witness's house. Witness could not say of his own knowledge that Louis went to Buffalo on that evening. He was in Buffalo on the morning of the Monday of the killing, and was arrested on Tuesday or Wednesday. Witness did not know where Louis was now.

R. M. Bryan testified that Louis Davis came to his house in Buffalo late on Friday evening, and talked to him about filing the complaint against Martin, and he did file it early on the next morning.

Two witnesses for the relators testified that both of the relators were poor men, owning but little property, and of small value. They knew of no friends through whom they could make large bonds.

*J. J. Dotson*, for the relators.

*W. L. Davidson*, Assistant Attorney General, for the State.

Hurt, Judge. The appellants, separately indicted for the murder of Robert Martin, sued out writs of habeas corpus, and upon the hearing before the Hon. Norman G. Kittrell, were denied bail. We are of the opinion that, under the evidence in the record, the applicants were entitled to bail.

The orders and judgments of the court below refusing bail are set aside, and it is ordered that the applicants be released upon each giving bail in the sum of five thousand dollars in the manner and conditioned as the statute prescribes.

Opinion delivered October 13, 1888.     *Ordered accordingly.*